21-839. We'll dispense with calling the calendar. I will also note that we have two other matters on submission on today's argument calendar, Buchanan v. Hess, 21-649, and United States v. Madeira, 24-076. I will also note that we have two other matters on submission on today's argument calendar, Buchanan v. Hess, 24-076. Those are deemed submitted, and as to each, we'll reserve the decision. So we'll proceed right away with Salim. Mr. Rosen. May it please the Court, good morning. Accounting standards require Mobile TeleSystems, also referred to as MTS, to estimate its liability for potential FCPA violations in its accounting financial statements. Now, estimates are, by their nature, uncertain and imprecise, yet they are essential to financial statements, and they do not undermine their reliability. To quote IAS 37-25 It's not an absolute requirement, is it? In other words, there should be an estimate made if it's reasonably possible? Or are you saying it's an absolute requirement? It's an absolute requirement unless it's not feasible to make an estimate. And IAS 37-25 specifically says, except in extremely rare cases, and then we will be able to determine a range of possible outcomes. And one of those extremely rare cases, as I understand it, is a lawsuit, for example. Is that correct? No, Your Honor. I don't think that's an accurate portrayal of what IAS says on that issue. In fact, that's IAS 25. And what IAS 25 actually says is, when you have a lawsuit, you have to consider all potential outcomes, including adverse and positive outcomes, and make a reasonable estimate. But there wasn't even a lawsuit here, not until some years in. Your Honor, there was not a lawsuit. However, there was an investigation, and in 2015, there was the DOJ complaint. But, Mr. Rosen, they disclosed that, right? In the 2016 filing, they disclosed the 2015 complaint. I understand your point about the 2015 complaint. That's a significant thing when the government files a forfeiture allegation that clearly implicates wrongdoing at the company. But that was disclosed, and the complaint itself, I think, had dollars, $380 million in it. So an investor, I know they didn't put that number in their filing, but certainly an investor was aware of the complaint and could have looked in the file and found an index number or any way to find the complaint. So there's literally hundreds of complaints filed by the United States of America and the Southern District of New York in 2015. They would have to search through 300 to 400 complaints. And if they found it, then they would have to determine what it meant. Okay, there's a $380 million set of illegal payments, but what does that mean for the company? And you'd have to go to a lawyer who specializes in the SEPA to truly understand what that meant. But if one investor did that, then that one investor would know, after he spent all the time, effort, and money to consult with the lawyer. But that lawyer wouldn't necessarily, in fact, that investor wouldn't necessarily let all the other investors in the public know. So this was a... Would you think it would have been sufficient for them to, at that point, disclose $380 million in their filing? Do you think that would have been sufficient? Your Honor, I think at the very least, they should have said there are $380 million of alleged bribes paid. They could say we dispute that, we believe we're innocent. However, if we're found guilty, the SEPA calls for and the question is, no, you do not think it would be sufficient to just say here's the amount. Is that correct? Well, if they... First, they didn't say... So they also have to go to the guidelines and disclose the guidelines exposure? At the very least, to be consistent with SCFC, they should say there's $380 million of bribes at issue. And that would at least give the people a sense of something. Why is it, you know, the Pareto case is a very good example where the judge said, you can't simply say we're unable to estimate because we may dispute it. It's very unusual. The disclosure is that the fines or penalties could be significant. Why isn't that adequate notice? Particularly when you think of the big picture. The big picture is you're being investigated. Why would you say publicly, oh, we think we're going to be liable for X amount in penalties? You're going to be hurt either way. I mean, if it's low, it's going to come back to haunt you. If you make it high, you're sort of giving ammunition to the government. So it seems to me that it would be imprudent to give a range. Well, they are allowed to say that they don't want to prejudice their position. And so they're not going to give an estimate. They didn't do that. So they didn't follow death sentence. But they wouldn't be prejudiced in their position if they said the government has filed this complaint alleging illegal payments and may allege their violations of the SEPA. They said that in the complaint. And instead, they mention the complaint and they say the complaint is not corrected at MTS and that the complaint will have no impact on MTS's assets. So that really downplays the significance of the complaint and says this is really not going to have impact on our business. So you say they should have said the government has alleged $380 million in bribes. And then what? It's left at that? Or should they also say we deny that? We don't deny. Well, that's the problem is whatever they say, whatever they say could lead to complications. There's always complications, Your Honor. But GAAP has standards and they violate those standards. The purpose of GAAP is to provide information to investors about these liabilities. That's what GAAP requires. Some information, some quantification. And IAS 37-86 specifically says that you have to provide a description, not just a description, but a description of the uncertainties that will affect the amount. So not just, they could have at least said $380 million is an issue and the uncertainties that affect our liability are guidelines or whether we're guilty. There's all sorts of things. But they said nothing. So the requirement, I'm just trying to understand what it is that you are asking us to embrace because these are very important issues set aside the Omnicare issue. The requirement that you want us to embrace is that when there is uncertainty and GAAP or the international equivalent, whatever it is, but GAAP here, allows for an expression of uncertainty in estimating whatever the metric is. Then the company, the issuing company, the filing company, must say we are uncertain. Is that enough? I thought you were saying that that is not enough. I do not think they can simply say it's uncertain. If they are aware of quantity, and even if that quantity is a range, whether it's a range or a maximum or a minimum, if they are aware of quantity, they should disavow. When the DOJ complaint was filed in June 29, 2015, they admitted having read by August. You would admit, absent that complaint, going back to Judge Chin's point, if they were doing an internal investigation, seeing some potential numbers coming out of the internal investigation, you would agree they don't have to then put in their filing. We think our liability, based upon a calculation of the guideline range, based upon our internal investigation, would be X. That would be really unusual, right? I would agree that if there is no evidence of what their potential liability is, if they don't know what the payments are yet, if they haven't completed their investigation... So the key here is the government's forfeiture complaint. Yes, Your Honor, I agree. The 2015 DOJ complaint was a key fact, a key set of facts that gave them all the information they needed to know. And your argument on that is, even though they referenced it in the filing, because they didn't have, like, a docket number, they didn't put the amount in, that's too much to ask the investor to do, to go find it? Yes, because there's hundreds of complaints in the seven digits of the U.S. I know, but it's a... What is the... I tried doing that yesterday, Your Honor, and 300 complaints came up. I think that's borderline, Your Honor. Why is that borderline? Because that directs the investor to the complaint that you were saying is hard to find. I'll tell you what, because one has to go back to the basic purposes of a financial statement. And the purpose of a financial statement is to give investors a sense of the assets and liabilities of the company. What is the condition of this company? And this is, you know, a major criminal liability like this. It's a very important thing. You could mean this stock is no longer traded. It's a very important thing. And so it's important to give... If they have that information and it's all in their possession... But the information... But correct me again if you think I'm wrong, Mr. Rosen. The information has got to be subject to some reasonableness standard, right? The fact that is, it's got to be reasonably estimable. Do you agree with that? Yes. Because it's a financial metric, right? And here, as I understand it, what are we to make of the fact that there are two other associated companies who were also embroiled in this FCPA investigation? They're ultimately very different results. Well, the results weren't that much different. I mean, under the guidelines, one got 25 percent below, one got 45 percent below. But your answer to one of my questions was they should have referred to the guidelines. Discretion. But there was no discretion as to whether they were going to prosecute because they didn't self-disclose. So under the FCPA guidelines, Appendix 5485, they were going to prosecute. All the examples say they were going to prosecute. And so they had that narrow range. And they start with the $600 million based on the multiplier and the time, and then they get the range. And they were both minimal contemplated. So your argument is that with a 50 percent reduction for cooperation, $304 million, $304 million would be the minimum they would have, right? The minimum they should have disclosed or reserved, that amount, is that your argument? Yes. They would have to approve or disclose a minimum of $304 million. But since they didn't self-disclose, really it's $450 million. Okay. Yes, Your Honor. Okay. I think we have your argument. You have also reserved some time for rebuttal. So we'll hear from your friend on the other side, Mr. Martinez. Good morning, Your Honor. I made a case in the court. For two reasons, plaintiffs are wrong to invoke the securities laws and try to punish MTS's alleged accounting violation here. First, there was no false or misleading statement. MTS disclosed the key facts and warned investors that DOJ's probe could lead to significant penalties and adverse impacts on their financials. MTS's decision not to more specifically estimate a potential loss amount was a reasonable accounting judgment. Would you agree that if at a certain time the Department of Justice Fraud Section said, this is what we think is the right number in terms of the actual penalty that we will seek to impose, and, you know, DOJ is an 800-pound gorilla here, would you agree that the company would then have to disclose that penalty? I don't know. I think I would need to know more about the context, Your Honor. I think, for example— The Department of Justice has told you, we've investigated this, and this is the amount that we are going to seek. I think if they said that, for example, in a sentencing memo after trial, that that would certainly be a time in which that kind of statement by the Department of Justice, you get a lot closer to, like, the Frigo case. There's a pre-sentence report and the Department of Research— So isn't it also the case that the vast majority of these FCPA investigations result in a negotiated settlement, either through a DEPA or a DPA, but some negotiated settlement? A lot of them do, Your Honor, but I think in this case in particular, there are all sorts of reasons why there were questions about whether that would be the case, what the right amount would be, just to sort of slide a couple of key, unique facts about this case. I think one of the things that jumps out the most is the fact that there was no pecuniary meeting here. As the Deferred Prosecution Agreement made clear, my client didn't make any money. The company was expropriated when they refused to continue making the corrupt payments. So, Mr. Marquis, is it your position that if, let's say, the government sent a letter to your client saying, we've done an investigation, we believe that there are $380 million worth of bribes, and we have opened an investigation, under the accounting rules, is it your position that the company does not need to reserve maybe $380 million for the potential loss there? Isn't that a reasonable estimate of the loss at that point, if the government is telling you that? I think if the assertion is essentially we think that there were $380 million in bribes paid— Weighed out. On these days, here are the days of the bribe. We've investigated it. We think your liability is $380 million. I don't think so, because I think it would depend on a number of other factors. So you wouldn't have to even disclose that to the investors? Well, I think you would disclose the fact that you're being investigated. How about the number? Well, the number of the—the amount of the bribes is, of course, different from the amount of potential exposure to the company. But I think that— Why isn't that a material fact that should have been disclosed? For example, in the April 2016 20th, that—because the amount of the bribes is important. Right. We think essentially it was disclosed, Your Honor, in the sense that they did disclose the publicly available complaint, coupled with the fact— Well, they disclosed—Mr. Rosen says they disclosed the facts of the publicly available complaint without disclosing some material facts in that complaint. Fair enough, Your Honor. They were not specific about the amount of the bribes that were spelled out in that complaint. But I think just a couple of points on that. Number one, the complaint was publicly available. Number two, the complaint itself in this case—this is at page 857 and 858 of the joint appendix— the plaintiffs themselves allege that the number amounts were already in the public domain. They were already public. They say that in—in first cap in 2015, an organization known as the Organized Crime Interruption Reporting Project had already publicized the number. And they say that there's a Wall Street Journal article a couple months later that talks about hundreds of millions of dollars in bribe payments. I think they coupled with the fact that this was a publicly available complaint. I think—but the reports like that are not as powerful as the government filing a forfeiture complaint listing the actual payments. That's much more concrete than general reporting. So I think— That's fair enough, Your Honor. And that's why the company expressly mentioned the fact that the government filed it. I think the only kind of question is could they or should they have gone further and pinpointed the exact number? And I think given that the complaint was publicly available— Well, it's two things. It's the not having the number and then, as your adversary noted at the end, it says the complaint is solely directed towards assets held by the unnamed Beck official, and none of MTS's assets are affected by the complaint. And that has obviously a different tone to it. If you're an investor reading that, you may think, okay, this is unrelated. It's not directly related to the company. Well, they're related to disclosures. I think the company was clearly recognizing that— Yeah, but the disclosure is that's someone else's problem, not my problem. It's downplaying it is the argument. Your Honor, I think they were trying to be accurate and trying to distinguish the fact that the bribe amounts that were listed in that complaint were different from what the potential exposure is to the company just because they were talking about penalties. I think just sort of stepping back, though, if you just look at what the company did disclose, they disclosed the investigation, they disclosed the complaint, they updated the disclosures to include the complaint. It was publicly available. These other facts were available in the public record. The claims themselves rely on the show, the amounts, the magnitude. The company said that there were significant penalties potentially involved. And it was always open to any investor or any analyst on these calls. They could have just asked if there was any confusion about what complaint or what's the docket number. That could have been asked. I don't think it was asked because it was so clear from the materials that were already in the public domain. So for all those reasons, we think that the disclosure was adequate here. And I think there are other additional reasons to reach that conclusion. Number one, this is Deloitte. Looked at this and agreed that this was the right and proper way to make this disclosure. Number two, DOJ and the SEC, both of whom looked very closely at the company throughout this entire period, they never raised any concern about that. So I'm very concerned about this particular argument. Have we ever said that the absence of a federal investigation, either on the criminal or the civil enforcement side, is dispositive or even a sign that a private dispute between two parties is resolved in favor of the defendant? So why do you bring that up? I bring it up, Your Honor, because I think that if it had been the opposite, if the SEC had been investigating on this point, I think it would be fair game for the other side to bring that up. So I think this is an additional contextual fact. Yeah, I'm not sure it goes both ways. Well, I think if it's a plus factor for them and the absence of the plus factors, I think it would be a worthwhile fact to note. I don't think it's dispositive, Your Honor. I'm not trying to oversell the point. But I think contextually, sort of looking at this in a common-sense way, the SEC... I mean, the beauty of this, the beauty of our system, Mr. Martinez, is that you've got private attorneys general to deal with things when the government does not have the resources at the federal level to review everything. I think that's a fair point, Your Honor. I think the only other point that I would add on this is that the way that MTS treated this particular disclosure is sort of consistent with sort of standard practice. If you look at the other similar SEC cases for similar amounts of money from around this period of time, we cited them in pages 35 to 37 of our brief. The disclosure that MTS made was about three, three-and-a-half months before the ultimate deferred prosecution agreement, which was earlier than all the other... I haven't looked at all those cases, but it could be in those cases. Those were just situations with an internal investigation going on, and then at the end of the day, there was a DPA. The key here, I think, that may distinguish it from those cases is this complaint in 2015 where there was a filing with an identifiable number in it. I'm not sure in those cases there was that type of... Well, I think in all those cases, there were negotiations that led to... I know, but negotiations are much different than... Again, I don't want to go back to what we discussed about it, but if your company, if the government filed something directly against your company alleging an amount, you don't think even at that point you'd have to set aside a reserve for whatever amount the government was alleging? I think that once you get to a point, and this is exactly what the company did in November of 2018, once you get to a point where it becomes clear as... You filed against the company alleging $380 million in bribes. I think certainly you would disclose that and... And set aside a reserve, right? It would depend on, I think, a number of factors, including the strength of your defenses, what you think that, you know, if there's a glaring statute of limitations problem in the case, if there may have been... Yeah, but these are still... I mean, look, the issue, there still is a loss contingency. So, you know, and I understand your arguments relating to judgment calls, but there's a limit to the judgment call, right? What is that limit, Mr. Martinez? Well, I think, Your Honor, this is a judgment call. I think... But you disagree that there are limits to judgment calls. And there are absolutely limits, and I think that's why the company operating within those limits disclosed the investigation, disclosed the complaint when the complaint came up, disclosed the fact that settlement negotiations were underway, when they were underway, and then took the approval, it became clear in the middle of those settlement negotiations roughly what the company thought the amount was going to be. So I think at every step, the company was operating within those limits. May I ask you, maybe the flip side of that is, why didn't it take that approval or try to estimate the contingency at the time of that June 2015 complaint? Can I make two points on this, Your Honor? I know I'm starting to run out of time a little bit. I gave your friend some time, so... Thank you. I think there were a lot of different variables in play at the time that the investigation was announced and started. And the facts that are true in every case, this was very early stages, you've got prosecutorial discretion, you've got questions about defenses, you've got questions about what the government's going to be able to approve to a jury, and then you've got questions about discretion on the sentencing side. In this particular case, all those considerations were in play because the government's case would have been based entirely on recorded evidence. They didn't have witnesses here. They were going to have authentication problems with documents. I think those are all good arguments for why you wouldn't do a guidelines calculation and put it in your filing because that is pretty speculative at that point. But it doesn't really address the issue why you wouldn't always put in the dollar amount that the government is alleging was involved. I think it's certainly the case that the government could have put the dollar, that we could have put the dollar amount in, but I don't think that... We weren't trying to hide the dollar amount, and I think the reason you could think that is... The reason it's fair to conclude that is because we referenced a complaint that had the dollar amounts. The complaint was publicly available, and there was other facts out there in public that made the dollar amount clear. But I want to sort of... We've been talking a lot about the primary issue, which is whether there's an accounting violation. I want to make sure just to emphasize there are two additional points here relating to Omnicare, and then even more fundamentally with respect to Santer. Omnicare, I won't get into in great detail, but I do think this is an opinion statement, just like the court... Opinions are made up, at least in the context of these types of cases, of predicate facts, right? So you have a series of facts, and you can express an opinion. Here, what is your view of what the opinion is that was expressed? The opinion was that given these underlying facts, it was not possible to make a reasonable and practicable estimate of the loss rate. That was the opinion, just like the very almost identical to the opinion in the Andrea case. It's similar to the opinion in the Faith case, where this court recognized that when you have to make estimates of goodwill sometimes, that's an opinion, just like the opinion here. I may regret my vote in the Faith case, but that's a separate issue. Your Honor, I think, you know, to take your vote in a different case, the SAIC case, I think if you look there, this case is actually sort of analogous to the June 2011, I think it was the 8K in that case, where the court found, even though it found that the case had moved forward on other statements, the court found that it couldn't move forward with respect to the June 2011 statement. No, but that opinion undermines your point that somehow these are all opinions that can't be actionable. Judge Bollea's decision made clear, if there's enough there, you can't just rely on the idea that these types of opinions are inherently, these types of issues are inherently opinion, right? Well, but I think in the SAIC case, the problem was that there was no disclosure of anything. And here, there was disclosure of the investigation, the potential for significant penalties. Can I just... Are you... Can I just stick with this Omnicare opinion? Issue for one second. It is not your position, Mr. Martinez, that any metric that involves a range, and it could be a very wide range, and involves judgments about where, within that range, a company should reserve, for example. It is not your opinion that... It is an opinion, right? I think it would depend on exactly what range. I think I can imagine certain ranges that are not opinions, but I think certainly the opinion, the range that was called for here, and the need for a reliable or practicable or reasonable estimate, certainly was an opinion, for the same reasons that the O'Brien report laid out. Can I try the same thing? Here, but here, I think what we're talking about, and I think this is what you're saying, the opinion was that an estimate could not be reached. A reasonable estimate. A reasonable estimate could not be reached. I think certainly the company could have said... And as of June 2015, why is that a reasonable statement? Why is that an opinion, as opposed to a factual statement? Because the company was looking at a whole bunch of different variables relating to what they do in June 2015. It was at sort of stage one. Basically, it was an investigation, and the company knew that there were these specific broad pandemics that the government had alleged in the complaint against... So your ultimate argument is, we don't have to deal with any of this because it's Sienta. I think I would say that there's no accounting problem. Even if there's an accounting problem, it's not a securities problem because of unpaid care. Even if there's a securities problem, potentially because of unpaid care, there's still no Sienta. Is that different from what I just said? I think I'm just... Maybe it would be sort of three different ways of looking at it, Your Honor. I do think that Sienta is the most straightforward. And if I could just sort of make three points about Sienta. First, you don't have any of the classic initia of Sienta. There are no insider stock sales. There's no confidential witnesses. There are no smoking gun documents. There's no restatement of the financials. There's no dispute with the auditors. There's no motive or opportunity here. Second, I think that looking at Sienta, it's really important to focus on the nature of the alleged nondisclosures here. And here, the nature of those nondisclosures makes it unlikely that there was any intent to defraud. The accounting judgments here are apparently subjective. That means that if you conclude that an MTS made a mistake, the most reasonable inference to draw from that is that it was an innocent mistake and it wasn't a deliberate attempt to fool anyone. There's no reason to jump to the conclusion that this was intentional. And then finally, I think really bolstering the Sienta problem that my friend on the other side has is the fact that MTS did disclose a lot. We talked about the potential for significant penalties. We talked about the investigation. We disclosed the DOJ complaint. We disclosed the fact that settlement negotiations were underway. We disclosed the fact that settlement negotiations were getting more serious, and we were able to predict the number of death permits available. And so I think for all of those reasons, given the robust disclosures that were made, even if you conclude that they weren't sufficient under the accounting rules, those disclosures I think really undermine the idea that there was a deliberate intent to fool anyone here. And so for all those reasons, Your Honor, we would just respectfully ask you to affirm the judgment below on either of its alternative grounds, no falsity or by no standard. Thank you, Your Honor. Thank you. Mr. Rosen. And Mr. Martinez, please put your mask back on. Thanks. Yeah. ASC 450-20-25-5 says that if the estimated loss is within a range, then some loss has occurred and can be reasonably estimated. So the fact that they have this guideline range under GAAP can be reasonably estimated. Could you address Sienter? I'd be interested in hearing your response to the arguments regarding Sienter. Yes, Your Honor. So in some respect, the falsehood in Sienter is that the facts, the analyses collapse together. Because it's a question of having knowledge of facts that make their statements false or give them the opportunity to make the reasonable estimate and determine whether or not it's probable. And so here, they have all of the facts. And they admit that they have all of the facts in their possession by July 2007. Well, I mean, just using the one fact, they didn't disclose the $380 million number. In light of all the other circumstances, were they intending to deceive by not specifying the number? I think that one fact really shows their intent to mislead. When they describe a complaint and they say that it only is directed at the unnamed Uzbek official and it will have no impact on our assets, that's really an intent to mislead investors to think that this is not a significant complaint. And in addition to that, the amount of reliability as, let's say, in their analysis of $850 million is about a year's worth of profits for them in that time frame. In addition, rather than terminating the participants, for example, Kordaev got promoted to CEO when these payments were made while he was CFO. In addition, as they learned facts, each quarter they learned more and more facts about the reliability. Beginning with the investigation, the DOJ complaint, the payments were delineated, and then the digital comp played duty and they saw the findings that they got. So each quarter, more and more information comes into their possession, and yet their disclosure does not change from day one. And the gap, particularly that the gap that's described above, it says as you get more information you should be providing an update to your estimate of liability. So all of these facts show that, again, there's no non-cumulative interest here. You can have a very serious criminal scheme, corrupt scheme to pay hundreds of millions of dollars, according to Kordaev, worth of bribes. And the same people who participated in that bribery scheme were the people who put together these financial statements. And so while standing alone, the motive that they wanted to protect the reputation and preserve their ability to raise money and do business and have a public company, that standing alone is not sufficient. But it certainly gives you a sense of why they might want to downplay this, so that they put off the reputation, because it makes them look very bad. And so all of the facts really weigh in favor of CNN. There's really nothing against it in their favor. And lastly, I think Judge Cook's decision in Parado is important. And it's consistent with the SEC comment letters that we put in the appendix. She says that if a company can simply, when they're facing a contingent liability such as this, if they can simply say, well, we disputed and we can't predict the outcome, and therefore we're not making a payment, if they can do that and never have to recruit or disclose the amount, then they never will. All they have to do is say, we disputed this and it's unpredictable. Well, here the company eventually did, when they say it became reasonably estimable. Yes, Your Honor. But they had signed. At that point, they had a single number. It was about November. They disclosed the approval. They signed the agreement in January. So it's less than three months. And during that time, they were just finalizing the BPA. And so they had waited until there was a single amount. And that's exactly what GAP says they shouldn't do. GAP says you should not wait until there's just a single amount to approve the liability. You have to make the estimate as soon as you're able to. Or disclose the fact of the investigation and say, we cannot estimate. It is not possible to make an estimate. Isn't that information valuable to the investor? The fact that they can't make it. Well, it would be valuable if it were true. But they couldn't make an estimate. And they could make a very reasonable estimate of the guidelines. It's pretty narrow, right? It's 450 to 850. What's your argument? But it's very hard to police every public company in the world. But you're requiring, effectively, Mr. Rosen, this is just sort of a question that expresses a concern. You are asking us to announce a rule that would effectively require every company that is told by the SEC or by the Department of Justice, by the fraud section, that the SEC or the department is undertaking an investigation, a CPA investigation, you must, at that point, disclose some reasonable estimate of your liability. That would be the rule. That would be the rule that every smart company, issuing company, either as a matter of a 20-F or in their domestic filings, that would be the rule that they would have to disclose that, some amount. They'd have to make an estimate, get all their accountants, get Deloitte to make that estimate. Yes. Yes, I think that's true. And that's what GAAP requires. And as long as they have sufficient facts to make a reasonable estimate. And in some cases, it may not be. A first-order reaction is very different than an SMGA violation. Or environmental liability, where you're not sure how many people were affected, and it's early stage. It's a different situation. Because it's pegged to the amount of the block, is what you're saying. Yes. It's a pretty narrow page. Thank you very much. Thank you very much. Rule of reserve decision. That concludes today's argument calendar. Court is adjourned.